2012 ME 117

**J. Cole HARRIS et al.**

v.

**The WOODLANDS CLUB et al.**

Supreme Judicial Court of Maine.

Argued: Sept. 13, 2012.
Decided: Oct. 11, 2012.

Gerald F. Petruccelli, Esq. (orally), Bruce A. McGlauflin, Esq., and Jisel E.

Lopez, Esq., Petruccelli, Martin & Haddow, LLP, Portland, for appellants J. Cole Harris and P. Daphne Harris.

Jonathan W. Brogan, Esq., and David A. Goldman, Esq., Norman, Hanson & De-Troy, LLC, Portland, for cross-appellant The Woodlands Homeowners Association.

Thomas R. McKeon, Esq. (orally), and Joseph L. Cahoon, Jr., Esq., Richardson, Whitman, Large & Badger, Portland, for cross-appellant The Woodlands Club.

Panel: ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

ALEXANDER, J.

[¶ 1] J. Cole Harris and P. Daphne Harris appeal from a judgment of the Superior Court (Cumberland County, *Warren, J.*) in favor of The Woodlands Club and The Woodlands Homeowners Association (collectively, the Woodlands). In their complaint, the Harrises allege that the Woodlands tortiously discharged surface water onto their property causing flooding and an increase in wetland. The Harrises challenge the court's (1) entry of a judgment in favor of the Woodlands following a nonjury trial on the Harrises' common law trespass claim, (2) grant of a summary judgment in favor of the Woodlands on the Harrises' claim for negligence, (3) entry of a pretrial order excluding certain testimony, and (4) refusal to grant the Harrises an injunction. The Woodlands cross-appeals from the court's judgment on the Harrises' common law trespass claim, ar-

guing that its legal characterization of their drainage system was flawed. We affirm the judgment.[1]

## I. CASE HISTORY

[¶ 2] The following facts are taken from the court's written findings following a nonjury trial and are viewed in the light most favorable to the judgment.[2] *See Van Dam v. Spickler*, 2009 ME 36, ¶ 2, 968 A.2d 1040.

[¶ 3] The Woodlands Club is a corporation that operates a golf course in Falmouth. The Woodlands Homeowners Association is a corporation that owns the common elements of a residential development that surrounds the golf course as well as the golf course itself, its cart paths, and its drainage facilities. The Club leases the golf course from the Association pursuant to a long-term lease.

[¶ 4] Fairway Villas, Inc.[3] was the original developer of the Woodlands. As part of the development, Fairway Villas submitted a permit application to the Maine Department of Environmental Protection that included plans and designs for the golf course and the residential development. The designs included plans for the stormwater management system. The Department issued a site-location permit in 1987.

[¶ 5] In 2004, the Harrises purchased a twelve-acre parcel that abuts the northern boundary of the Woodlands Club. The land was the topographic low point to which water would drain from the Woodlands

---

1. Because we affirm the judgment against the Harrises, we need not address the portion of the judgment related to the injunction.

2. Although we review the facts from the parties' summary judgment pleadings for purposes of the Harrises' challenge to the summary judgment against them, *see HSBC Bank USA, N.A. v. Gabay*, 2011 ME 101, ¶ 8, 28 A.3d 1158, the summary judgment facts are

not, for purposes of review of the issues on appeal, materially different from those found by the court after the trial.

3. Before changing its name, the entity called itself the Woodlands Corporation. Fairway Villas, Inc. was named as a third-party defendant but was dismissed before trial.

property and other properties before any development at the Woodlands. The relevant watershed in this case, Watershed A, is located on the northwest portion of the Woodlands development. Before the Woodlands was constructed, Watershed A drained, following the natural contour of the land, onto what is now the Harris parcel, mostly at a location known as Discharge Point A.

[¶ 6] The Woodlands stormwater management system was designed to slowly drain water into areas where it would naturally discharge, including the Harris property. The stormwater management system featured topographic bowls or basins typically not entirely filled with water that were either artificially created or naturally occurring. Some of the bowls also serve as water hazards for the golf course, which means they contain some water that fills only a fraction of the bowl area.

[¶ 7] As built, the Woodlands stormwater management system varied from the plan approved in the Department permit. Particularly relevant to this case is a basin that included part of the third fairway, which is near the Harris property. The basin as designed was to be bordered by an elevated golf cart path. As built, however, the path is a foot lower than that for which the design called. Further, two culverts not shown on the plan were placed along the rim of the basin, and the spillway as built is longer than that for which the plans called.[4]

[¶ 8] The purpose of the stormwater system is to prevent erosion and sudden surges of water by controlling the rate at which stormwater flows onto neighboring properties. Even as built, the stormwater system has achieved this goal because the rate at which stormwater flows across the northern boundary of the Woodlands meets Department requirements and does not exceed the rate at which stormwater flowed onto the Harris parcel prior to the development of the golf course.

[¶ 9] Although the rates of stormwater flow have not increased, the construction of the golf course and the residential development have increased the total volume of stormwater discharged onto the Harris parcel. This occurs, the evidence indicates, because developed lands with cut grass surfaces and impervious surfaces such as golf cart paths and other common features of development tend to retain less stormwater than brush, grasslands, and woodlands in their natural state. A hydrologist testified that the development increased the volume of stormwater discharged in a two-year storm event by thirty-one percent. The Woodlands accounts for twenty-four percent of the stormwater discharged at the southern boundary of the Harris parcel during a two-year storm event. Larger storms result in larger volumes, but the percentage of stormwater for which the Woodlands is responsible in larger storms decreases.

[¶ 10] There was no evidence that the drainage system as built discharges more stormwater than it would have had the original design been followed. The evidence supports the court's conclusion that all of the increased stormwater discharged onto the Harris parcel from the Woodlands is runoff that would have been discharged onto the parcel even if the Woodlands did not have a stormwater management system to collect and channel stormwater.

[¶ 11] After storms, particularly when the ground is frozen, there is standing water on the Harris parcel. The location

4. After the Harrises brought the discrepancies between the approved plan and the golf course as built to the Department's attention, the Department issued a notice of potential violation, but no further action had been taken by the time of trial.

of the standing water is largely within areas that constituted wetlands before the Woodlands was developed. Stormwater from the north, the side opposite the Woodlands, also contributes to the wetness of the parcel. In fact, during storms, more water drains onto the Harris property from the north than from the Woodlands to the south. Because of the development of the Woodlands, the amount of wetlands on the southwest corner of the Harris parcel has increased marginally. The Woodlands did not cause other increases in wetlands in other areas of the Harris parcel.

[¶ 12] The Harrises knew or had ample reason to know, before they purchased the parcel in 2004, that the property included substantial portions of wetland and received stormwater runoff from the Woodlands and other properties. At that time, all of the drainage features at the Woodlands already existed. In addition, the existence of a stream[5] that crossed the Harris parcel and arrived at a culvert[6] under Woodville Road was apparent on the face of the earth even before the Woodlands was constructed.

[¶ 13] In November 2008, the Harrises filed a three-count complaint against the Woodlands alleging statutory trespass, common law trespass, and negligence. The Woodlands moved for a summary judgment. The court granted a partial summary judgment in favor of the Woodlands on the statutory trespass and negligence claims. The court concluded that disputes of material facts precluded a sum-

mary judgment on the common law trespass claim.

[¶ 14] Before trial on the common law trespass claim, the court granted the Woodlands's motion to exclude the testimony of the Harrises that, in their opinion, the value of their property had declined to about $500,000 from about $3,500,000 because of the alleged trespass. Previously, the Harrises had represented their damages in their statement of material facts opposing summary judgment and in Cole Harris's deposition testimony as about $255,000. The court found that Cole Harris's opinion was disclosed so late in the proceedings—five days before jury selection and eleven days before trial—as to constitute a discovery violation pursuant to M.R. Civ. P. 26(e)(2)(B). The court found that Daphne Harris's opinion was also disclosed too late—after jury selection and five days before trial—and that her methodology was flawed. Subsequently, the Harrises voluntarily withdrew their claim for damages and elected to seek injunctive relief only in a nonjury trial; however, they sought to preserve for our review the court's exclusion of their testimony as to damages.

[¶ 15] The court conducted a nonjury trial on the common law trespass claim in May 2011 and entered a judgment, with extensive findings of fact, in favor of the Woodlands. The court concluded that the Harrises failed to prove that the Woodlands committed common law trespass. The court also explained why it would not have granted the Harrises' proposed injunction, noting that their proposal to pre-

---

5. The trial court's use of the word "stream" is somewhat inexact. There is no suggestion that the feature amounts to a watercourse, to which a different body of law would apply. *See Pettengill v. Turo,* 159 Me. 350, 355, 193 A.2d 367 (1963).

6. The record indicates that the culvert under Woodville Road, which drains water from the Harris parcel, is undersized. This means that water discharged onto the Harris parcel takes longer to drain through the culvert and more is drained into the Harris parcel in the process.

clude any discharge of water from the Woodlands by the construction of a dam—"would be completely impractical and was described by the Harrises' own hydrologist as an 'absurd' solution."

[¶ 16] The Harrises timely appealed the court's summary judgment on their statutory trespass[7] and negligence claims and the judgment after trial on their common law trespass claim. The Woodlands timely cross-appealed.[8]

## II. LEGAL ANALYSIS

### A. Common Law Trespass

[¶ 17] The Harrises argue that the Superior Court erred in finding that they had failed to prove that the discharge of stormwater from the Woodlands constitutes a common law trespass. A party who had the burden of proof at trial can prevail on a claim that the trial court should have found facts in that party's favor only if that party can demonstrate that such findings of fact are compelled by the evidence in the record. *Handrahan v. Malenko*, 2011 ME 15, ¶ 13, 12 A.3d 79; *Westleigh v. Conger*, 2000 ME 134, ¶ 12, 755 A.2d 518. When a trial court judgment is based on a conclusion of law, we review its conclusion de novo. *Goudreau v. Pine Springs Rd. & Water, LLC*, 2012 ME 70, ¶ 11, 44 A.3d 315.

7. The Harrises abandoned their challenge to the summary judgment on the statutory trespass claim during briefing for this appeal.

8. The Woodlands cross-appealed from a portion of the Superior Court's reasoning supporting its conclusion that no common law trespass occurred. When an appellee has prevailed in the forum from which a case is appealed, the appellee need not cross-appeal if it argues in favor of affirming the decision in every respect but simply contends that the same result should have been reached through different legal reasoning. *See State v. Me. Cent. R.R.*, 517 A.2d 55, 57 (Me.1986);

[¶ 18] We apply the modified common enemy doctrine to determine common law trespass liability for the discharge of surface water onto the land of an abutter.[9] *See* William P. Elliott II, *Diffused Surface Water In Wyoming: Ascertaining Property Owners' Rights and Settling Disputes*, 11 Wyo. L.Rev. 409, 414–15 (2011) (describing the modified common enemy rule). Our rule was most recently articulated in *Johnson v. Whitten* in which an abutter sued a landowner for blocking the flow of surface water causing the water to back up onto the abutter's property. 384 A.2d 698, 700 (Me.1978). In *Johnson*, we held against the abutter because a landowner "may control the flow of mere surface water over his own premises ... without obligation to any proprietor either above or below." *Id.* (quoting *Morrison v. Bucksport & Bangor R.R. Co.*, 67 Me. 353, 355 (1877)). *Johnson* includes an exception indicating that a landowner may nevertheless be liable for creating an artificial collection of water and discharging it onto land "where it would not otherwise naturally have fallen." 384 A.2d at 700. *Johnson* held that the abutter could not recover because the landowner's actions "caused the *natural drainage of surface water* to back up on plaintiffs' land." *Id.* (emphasis in original).

*Givertz v. Me. Med. Ctr.*, 459 A.2d 548, 556 (Me.1983).

9. In 2006, the Legislature enacted legislation providing that "[u]nreasonable use of land that results in altered flow of surface water that unreasonably injures another's land or that unreasonably interferes with the reasonable use of another's land is a nuisance." P.L.2005, ch. 564, § 1 (*codified at* 17 M.R.S. § 2808 (2011)). The statute applies to causes of action that accrue on or after January 1, 2007. P.L.2005, ch. 564, §§ 2–3. The parties did not argue that this section applies to this case.

[¶ 19] The court in *Johnson* implicitly reasoned that an artificial collection exists when surface water accumulates at a location through unnatural means and for a purpose other than drainage. *Johnson*, 384 A.2d at 700. *Johnson* used the phrase "artificial collection" to distinguish two prior opinions: *McRae v. Camden & Rockland Water Co.*, 138 Me. 110, 22 A.2d 133 (1941) and *Goodwin v. The Texas Co.*, 133 Me. 260, 176 A. 873 (1935). *Johnson*, 384 A.2d at 700.

[¶ 20] In *McRae*, we upheld a jury verdict finding that a pit dug below a valve house,[10] which overflowed, apparently while water was being pumped, when a drain beneath it failed, was an artificial collection. 138 Me. at 111–13, 22 A.2d 133. In *Goodwin*, we upheld another jury verdict finding that seawater was artificially collected when it was pumped along with dredgings to create new land on the shore. 133 Me. at 261–62, 176 A. 873. Illustrating a contrast to *McRae* and *Goodwin*, *Johnson* also cited *Morrison*, in which a railroad was held not liable when the design of its track caused surface water to accumulate and flood an abutter's land. 67 Me. at 357; *see also Murphy v. Kelley*, 68 Me. 521, 522 (1878) (applying *Morrison* ). *Morrison*, however, did not articulate the artificial collection exception. 67 Me. at 357.

[¶ 21] *Johnson* cited one opinion inconsistent with this implicit rule. 384 A.2d at 700. In *Smith v. Preston*, a pedestrian sued a landowner for negligence after the landowner's clogged gutter caused water to accumulate on a public way and freeze, upon which the pedestrian slipped and fell. 104 Me. 156, 158, 71 A. 653 (1908). *Smith* recited the artificial collection rule and analogized it to the discharge of water on to the public way at issue. *Id.* at 161, 71 A. 653. *Smith*, however, addressed the law of negligence, not common law trespass. *See id.* at 160, 71 A. 653.

[¶ 22] The stormwater management system at issue in this case does not create an artificial collection of water, as any accumulation is for purposes of drainage alone. If anything, the court's findings suggest that the bowls and basins in the stormwater management system, by retaining some water, may slow what otherwise might be a more rapid rate of stormwater discharge onto the Harris property. *Johnson* held that no liability arose from blocking the "*natural drainage of surface water*" from an abutter's land, causing flooding. 384 A.2d at 700. The two opinions distinguished in *Johnson* concerned water pumped to the defendant's land, for a purpose other than drainage, and then released onto a neighboring parcel. *See McRae*, 138 Me. at 111–13, 22 A.2d 133; *Goodwin*, 133 Me. at 261–62, 176 A. 873. Our earlier opinion explicitly held that the accumulation of surface water did not give rise to liability. *See Morrison*, 67 Me. at 357.

[¶ 23] Against this background, the Superior Court did not err in concluding that the Woodlands was not liable for trespass. The court found that the Woodlands's stormwater management system caused surface water to flow onto the Harris parcel. The system's sole purpose was to slowly drain stormwater. To the extent that the stormwater accumulated, it did so for drainage purposes alone.[11] Thus, no artificial collection existed.

---

10. A valve house is "[a] building to cover the valves and valve chamber of the mains from a reservoir." 3 Russell Sturgis, A Dictionary of Architecture and Building 933 (1902).

11. Notably, the trial court found that the water in the water hazards on the golf course filled only a fraction of the topographic bowls at issue, and thus, the presence of that water does not affect our analysis.

[¶ 24] The Harrises' arguments to the contrary are unavailing. First, the Harrises' reliance on *Smith* is misplaced because *Smith* was a personal injury action that did not address the law of trespass to property. *See* 104 Me. at 158, 71 A. 653. Second, the Harrises' argument that the trial court's ruling fails to account for the increase in water volume from the Woodlands development ignores that the *Johnson* rule is always applied when water volume increases.[12] Finally, the Harrises' contention that *Johnson* only applies to water that accumulates upland is without merit. Although *Johnson* directly concerned upland accumulation, its rule bars liability "to any proprietor either above or below." *See* 384 A.2d at 700.

[¶ 25] We affirm the Superior Court's entry of a judgment in favor of the Woodlands on the Harrises' common law trespass claim.

## B. Negligence

[¶ 26] The Harrises argue that the Superior Court erred in granting a summary judgment in favor of the Woodlands on the Harrises' claim for negligence. The Superior Court's judgment was based on its conclusion that, pursuant to Maine law, a landowner does not have a duty of care to an adjoining landowner regarding the discharge of surface water beyond the law of trespass. We review the Superior Court's conclusion of law de novo. *See Davis v. Dionne*, 2011 ME 90, ¶ 8, 26 A.3d 801.

[¶ 27] A landowner does not owe a duty to a neighboring landowner regarding the drainage of surface water that could give rise to negligence liability. As the Superior Court recognized, it is impossible to harmonize *Johnson's* general rule of no liability with a duty of care sounding in negligence. *See* 384 A.2d at 700–01. The Harrises again cite *Smith* in support of their argument, but *Smith* is again not applicable. In *Smith*, we held that the defendant's duty "was to repair the gutter and maintain it in a reasonably suitable condition to keep the water it collected from the sidewalk." 104 Me. at 160, 71 A. 653. As between *Smith* and *Johnson*, the *Johnson* rule controls the extent of potential liability in this area,[13] and we affirm the Superior Court's summary judgment.

## C. Exclusion of Testimony

[¶ 28] The Harrises argue that the Superior Court abused its discretion in excluding their testimony that the Woodlands's purported trespass reduced the value of their property to $500,000 from $3,500,000. The court excluded their testimony as a sanction after the Harrises failed to update their valuation opinions until the eve of trial after having offered different opinions during discovery.[14] *See* M.R. Civ. P. 26(e)(2)(B). We review the exclusion of testimony for failure to comply with Rule 26(e) for an abuse of discretion.

---

12. The Harrises cite *Pettengill* to imply that common law nuisance liability may exist in this case. *Pettengill*, however, concerned liability resulting from the blockage of a watercourse to which a different body of law applies. *See* 159 Me. at 355, 193 A.2d 367. The Harrises also argue that they are entitled to relief because the Woodlands violated its Department site permit, but violation of a civil regulatory statute is not an element of common law trespass. *See Radley v. Fish*, 2004 ME 87, ¶ 7, 856 A.2d 1196 (noting that the

violation of a government regulation does not, by itself, create a duty or an obligation toward a private party).

13. A landowner also may have a statutory nuisance remedy. *See* 17 M.R.S. § 2808.

14. The court expressed concerns about Daphne Harris's methodology in formulating her opinion, but its reasoning focused on the discovery violation.

*Beaudin v. Beaulieu,* 472 A.2d 426, 428 (Me.1984).

[¶ 29] The trial court was well within its discretion in refusing to permit the Harrises to testify that their damages amounted to $3,000,000. The damages claimed on the eve of trial—five days before jury selection by J. Cole Harris and after jury selection by Daphne Harris— were dramatically larger than the roughly $255,000 claimed earlier. Given the lateness of the disclosure, the stark change in the opinion, and the centrality of the issue of damages to the case, the trial court committed no error in its application of M.R. Civ. P. 26(e)(2)(B).

The entry is:

Judgment affirmed.